**KRIS A. MCLEAN**
Assistant United States Attorney
**W. ADAM DUERK**
Assistant United States Attorney
U.S. Attorney's Office
105 East Pine Street, Second Floor
Missoula, Montana 59802
Phone: (406) 542-8851
FAX: (406) 542-1476
Email: adam.duerk@usdoj.gov

**ATTORNEY FOR PLAINTIFF
UNITED STATES OF AMERICA**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**PAUL LYN NISBET,**<br><br>Defendant. | **CR 15-40-M-DLC**<br><br><br><br>**OFFER OF PROOF** |

## THE CHARGE

The defendant, PAUL LYN NISBET, is charged in Count I of the Second Superseding Indictment, with Conspiracy in violation of 18 U.S.C. § 371.

1

## PLEA AGREEMENT

There is a plea agreement filed in this case; NISBET will plead guilty to Count I of the Second Superseding Indictment. The United States did present any and all formal plea offers to the defendant in writing. The plea agreement entered into by the parties and filed with the court represents, in the government's view, the most favorable offer extended to the defendant. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## ELEMENTS

In order for the defendant to be found guilty of the charge in Count I of the Second Superseding Indictment, the United States must prove each of the following elements beyond a reasonable doubt:

- First, there was an agreement between two or more people to defraud Vann's, Inc. and others; and

- Second, the defendant entered the agreement knowing of its objectives and intending to accomplish at least one of those objectives.

- Third, the defendant performed at least one overt act in furtherance of the conspiracy.

## ANTICIPATED EVIDENCE

If this case was tried in United States District Court, the United States would present the following evidence:

Defendant PAUL LYN NISBET ("NISBET") was the Chief Financial Officer ("CFO") and George Leslie Manlove ("Manlove"), was the Chief Executive Officer ("CEO") of Vann's, Inc.

Vann's, Inc. ("Vann's") was a Montana Corporation that owned and operated retail electronics and appliance stores in Montana. Vann's was owned by its employees through an employee Stock Ownership Plan ("ESOP"). This ESOP was intended to provide Vann's employees with funds for retirement.

Vann's was managed by a five-member Board of Directors, with three independent members plus NISBET and Manlove. The Board hired Manlove to run the day-to-day operations of the company.

As part of the Board's responsibilities, the Board approved the overall compensation package for Manlove, including salary, bonuses, and fringe benefits. Although Manlove was authorized to make expenditures on behalf of the company as part of running its day-to-day operations, Manlove was not authorized to change the amount of his salary, benefits or compensation package. Furthermore, prior to making any material transaction involving Vann's funds, the Board required that it would be fully informed of any use of funds that was not an "arms-length" transaction, presented a conflict of interest, or appeared to be an expenditure for personal gain.

On March 30, 2007, the Board of Directors resolved that "any material transaction between related parties and transactions outside the ordinary course of business be approved by the Board before such transactions are entered into."

In addition to a base salary of at least $200,000, Manlove's compensation package at Vann's included a bonus program that provided incentives for meeting or exceeding profit goals for the company as a whole. That incentive program stated that Manlove could receive a bonus of up to 40% of his base compensation if profit and sales targets were met, a 45% bonus if they were significantly exceeded and a pro-rata reduction if these targets were not met. From the time that Manlove became CEO of Vann's on March 31, 2006, until June 11, 2012 (when the Board of Directors asked him to resign), Manlove received bonuses of between $80,000 and $100,000 per year.

In order to effectively direct and oversee Vann's, the Board required that NISBET and Manlove provide a complete and accurate picture of the financial status of the company. To accomplish this, NISBET and Manlove had a duty to inform the Board of any significant changes in Vann's financial status, inform the Board of any significant corporate gains, losses or expenditures, and forward to the Board complete and accurate financial records. It was the duty of both NISBET and Manlove to ensure that the Board was fully and accurately informed regarding the financial status of the company.

On July 14, 2011, two of the independent Board members resigned from the Vann's board, citing a lack of transparency and poor communication as reasons for their departure. On October 3, 2011, the third independent board member resigned.

NISBET and Manlove, in addition to serving as officers of the company, were designated as Trustees and Fiduciaries of the Vann's ESOP plan. As Trustees, NISBET and Manlove had a fiduciary duty to ensure that all ESOP assets were managed properly. A "fiduciary" is defined as an individual in whom another has placed the utmost trust and confidence to manage and protect property or money. It is a relationship wherein one person has an obligation to act for another's benefit. As fiduciaries of the ESOP, NISBET and Manlove were in a position of trust, tasked with the responsibility of safeguarding the assets of the ESOP and acting solely in the interest of Vann's shareholders. On August 5, 2012, Vann's filed for bankruptcy under Chapter 11.

### JPEG and the Outlet Store

On March 19, 2007, NISBET and Manlove formed JPEG, LLC, each contributing capital in the amount of $250 to form this company.

On April 11, 2007, without board authority, NISBET executed a "lease" between Vann's and JPEG, in which Vann's agreed to lease real estate known as the Outlet Store at Missoula, Montana.

On April 24, 2007, on behalf of JPEG, NISBET and Manlove obtained a loan from Treasure State Bank in the amount of $1,412,000 to purchase the Outlet Store. As part of the loan application process, NISBET and Manlove on behalf of JPEG, submitted to Treasure State Bank a Deed of Trust for the Outlet Store as well as an Assignment of Rents contract signed by both NISBET and Manlove as security for the loan. NISBET and Manlove, on behalf of JPEG, LLC, falsely represented to Treasure State Bank that there was a valid signed lease agreement between JPEG, LLC and Vann's.

On June 1, 2007, at NISBET and Manlove's direction, Vann's began making monthly lease payments of $15,900 to JPEG, LLC for the Outlet Store.

On March 4, 2008, NISBET wrote to C.R. (name withheld to protect privacy) at an accounting firm in an email that "We do not have signed leases for Bozeman, Lolo or the Outlet . . . ."

On June 30, 2008, NISBET and Manlove, on behalf of JPEG, LLC, refinanced the loan for the purchase of Vann's Outlet Store through First Interstate Bank by falsely representing to First Interstate Bank that there was a valid lease between Vann's and JPEG, LLC.

On March 2, 2011, NISBET provided a chart to First Interstate Bank that suggested that Vann's had valid, signed leases with JPEG, LLC and Painted Sky, LLC.

From June 2007 through March 2012 NISBET and Manlove received approximately $906,300 in monthly lease payments from Vann's Inc., including 12 monthly lease payments totaling approximately $190,800 after the store had closed.

### Kellogg MBA Degree

On September 2009, Manlove, enrolled in a Master's in Business Administration degree program at the Kellogg School of Business at Northwestern University in Illinois. Between September 2009 and June 2011, Manlove, assisted by NISBET, caused Vann's to pay all tuition and expenses for the degree program.

### Unauthorized Personal Expenses
### Credit Card Charges

Manlove, starting in 2006 and continuing into 2012, without Board authority, made purchases for personal goods and services that he charged to Vann's credit card, or submitted to Vann's for reimbursement, including: a class ring; airfare for family trips; hotel and travel expenses for a mother/daughter shopping trip to New York City; vacation expenses; personal expenses for a move to Park City, Utah; and tuition payments and other personal expenses while attending the Kellogg School of Business at Northwestern University. NISBET was aware of many of these expenditures and as CFO, authorized payment from Vann's funds.

## Club Memberships

On June 19, 2008, NISBET issued a $50,000 Vann's check to the Rock Creek Cattle Company (known hereafter as "RCCC") for Manlove's initial club membership fee.

On June 30, 2009, NISBET and Manlove, without board authorization, caused Vann's to pay Ranch Club membership dues for Manlove and NISBET in monthly payments for a total amount exceeding $6,000, with NISBET personally benefitting in the amount of $3,000.

On June 27, 2011, NISBET and Manlove, without Board authorization, caused Vann's to pay a $6,000 annual fee for Manlove's ongoing RCCC membership and continued to pay these fees from September 9, 2008, until June 27, 2011, for a total of $22,550.

## Jewelry Scheme

On September 30, 2009, Manlove, without board authorization, traded jewelry store owner R.E. (name withheld to protect identity) $18,750 worth of Vann's services and goods for jewelry.  This jewelry included a pair of princess cut diamond solitaire earrings valued at $11,750 and a Rolex GMT watch valued at $7,000. PAUL NISBET was aware of this exchange, but did not inform the board of the transaction.

## Family Benefits

During 2008 and 2009, Manlove caused Vann's to hire his daughter, C.M. (name withheld to protect privacy) and pay her compensation totaling $8,462.60 in 2008 and $6,634.35 in 2009. During that same time frame, C.M. was living in Denver, Colorado and not performing any work beneficial to Vann's Inc. As CFO of Vann's, NISBET authorized this "compensation."

On June 8 through June 13, 2009, Manlove caused Vann's to pay in excess of $2,000 for his daughter, W.M. (name withheld to protect privacy) and his wife J.M. (name withheld to protect privacy) to fly to New York City and stay in a hotel off Park Avenue for five nights as part of a "mother/daughter week" of shopping. PAUL NISBET was aware of this trip, but did not inform the board that Vann's paid expenses associated with this trip.

## Impending Bankruptcy

On January 11, 2011, Manlove sent an email to Vann's management, including Nisbet, stating that company bonuses would only be paid out of operating surplus and requested across the board salary reductions for all exempt employees and hourly staff reduction and reduced staff hours.

On February 4, 2011, Manlove sent an email to one of the internal bookkeepers at Vann's with a copy to NISBET. In the email, Manlove asked "Are we heading for a train wreck?" The bookkeeper's response, sent later that day,

stated: "It must come together this month and continue into March, or the train will run us down!"

On May 1, 2011, NISBET sent Manlove an email stating that cash was at a "critical point." Manlove responded by email that he was in class at Kellogg.

On July 5, 2011, NISBET sent Manlove an email stating that Vann's line of credit was maxed and that "backs are against the wall."

On July 14, 2011, Manlove emailed NISBET and Vann's managers that Vann's is now in crisis mode.

Despite NISBET's knowledge of Vann's financial peril and imminent bankruptcy, Manlove and NISBET continued to cause Vann's to make lease payments to JPEG, even after the Outlet Store went out of business.

From December 2010 through March 2012, NISBET personally benefitted in $119,250 of lease payments from Vann's to JPEG, LLC.

Respectfully submitted this 8th day of June, 2016.

                              MICHAEL W. COTTER
                              United States Attorney


                               /s/ Kris A. McLean
                              Assistant United States Attorney
                              Attorney for Plaintiff